TERESA C. CHOW (SBN 237694)
tchow@bakerlaw.com
DYANNE J. CHO (SBN 306190)
dcho@bakerlaw.com
ALEXANDER VITRUK (SBN 315756)
avitruk@bakerlaw.com
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:     310.820.8800
Facsimile:       310.820.8859

*Attorneys for Defendant*
EL CAMINO HOSPITAL

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDIGO SPALINGER, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EL CAMINO HOSPITAL<br><br>Defendant. | Case No.:<br><br>[Santa Clara County Superior Court Case No.:  23CV412292]<br><br>**DEFENDANT'S NOTICE OF REMOVAL**<br><br>Action Filed:      02/28/2023<br>Action Removed: 05/12/2023 |

### NOTICE OF REMOVAL

Over the past two decades, the federal government has engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions EL CAMINO HOSPITAL ("El Camino") has taken in connection with pursuing that directive. El Camino therefore removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In like circumstances, as explained *infra* at pp. 10-11, district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *see also Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581,

2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020). In support of removal, El Camino provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

## NATURE OF THE CASE

1. El Camino is a California nonprofit public benefit corporation with its principal place of business at 2500 Grant Road Mountain View, California 94040-4302.

2. On February 28, 2023, Plaintiff Indigo Spalinger filed a complaint against El Camino, in the Superior Court of the State of California for the County of Santa Clara, Case No. 23CV412292.

3. Plaintiff served El Camino with the Complaint, on or about April 3, 2023.

4. Plaintiff's three-count Complaint purports to challenge El Camino's routine on-line practices as various invasions of privacy, including alleged violations of the (1) California Invasion of Privacy Act, Cal. Penal Code § 631; (2) Confidentiality of Medical Information Act § 56.10; and (3) California's Constitutional right to privacy. *See generally* Complaint.

5. El Camino operates a website, www.elcaminohealth.org, that among other things, provides information to the public about El Camino and allows patients to access their medical records through the El Camino Health patient portal.

6. Plaintiff alleges she has used El Camino's website "f[rom] approximately 2021 and regularly accesses the Website using her phone, laptop, and desktop computer." Compl. ¶ 8.

7. The Facebook Pixel is one of several "Business Tools" offered by Facebook[1] that "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services." *Id*. ¶ 25 (internal quotations and citation omitted).

8. Plaintiff alleges that, the Facebook Pixel, allegedly used on El Camino's website, allegedly is a "piece of code" that "tracks the people and type of actions they take." *Id*. ¶ 27 (internal quotations and citation omitted).

---

[1] Facebook rebranded itself as Meta in 2021.

9. Plaintiff does not assert that El Camino discloses names, social security numbers, diagnoses, birth dates or comparable information to third parties.

## BASIS FOR REMOVAL

10. El Camino removes this case pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office …" *Id.* § 1442(a)(1).

11. The United States Supreme Court has directed that the federal officer removal statute is to be broadly construed, and that defendants may remove under this statute when they are acting under color of federal office. *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). To do so, a defendant must show that (a) it is a "person" within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a "colorable federal defense." *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 986–87 (9th Cir. 2019) (quoting *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099 (9th Cir. 2018)).

12. Since at least 2004, the federal government – through executive order, legislation, and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology. It has incentivized and directed providers who participate in the Medicare and Medicaid programs (like El Camino) to offer patients online access to their medical records, and to optimize patient engagement with their medical information. The federal government has also modeled the behavior it wants to see; it has created a portal for Medicare beneficiaries and worked with the same third-party services, with the same "source code," at issue in this case.

13. El Camino has dutifully assisted and followed the federal government's direction in this effort. In so doing, it has acted within the penumbra of federal action and office. Given this, and the Supreme Court's directive that the federal officer removal statute must be broadly

construed, and because this suit challenges this federally-directed conduct, the requirements of the federal removal statute are satisfied.

### The Meaningful Use Program

#### President Bush Establishes the Position of National Health Information Technology Coordinator

14. In 2004, President George W. Bush issued an Executive Order that established a National Health Information Technology Coordinator ("National Coordinator"). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id*.

15. Through the Executive Order, President Bush further ordered the National Coordinator to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." *Id*.

#### The National Coordinator Makes Access to Online Health Care Records a National Priority

16. From the outset, one important piece of this federal health information technology mission was the ability for individuals to be able to access their health records online. *See* TOMMY G. THOMPSON & DAVID J. BRAILER, MD, PHD, The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care, at pg. e (July 21, 2004).

17. But years later, when the percentage of Americans accessing their health information online remained low, the National Coordinator reported in 2015: "To truly empower consumers and move the health care system to become more patient-centered, *the government will need to help change these dynamics*." (*Id.* (emphasis added).) *See also, e.g.,* Joan Neuner, MD, MPH, et al., *Meaningful Use and the Patient Portal: Patient enrollment, use and satisfaction with patient portals at a later-adopting center*, AM. J. MED. QUAL. (Mar. 2015), at pg. 1 ("only 28% of physicians reported having EHRs that allowed patient access to records. Despite this, the architects of the MU rules have set the high bar for patient EHR access and communication.").

*Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online*

18. In 2009, Congress codified the Office of the National Coordinator in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009).[2] At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [National Coordinator]." *Id*.

19. As with President Bush's Executive Order, Congress tasked the National Coordinator with a series of responsibilities under federal law, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(3)(A) (Strategic plan).

20. Congress further codified a series of incentive payments for the Department of Health and Human Services, in conjunction with the Centers for Medicare and Medicaid Services, to make to health care providers for their adoption of health information technology, including through the Medicare program. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (CONG. RES. SERV. Apr. 27, 2009) (discussing various financial incentives).

21. As the Congressional Research Service explained at the time: "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs." *Id.*

---

[2] "There is established within the Department of Health and Human Services an Office of the National Coordinator for Health Information Technology." 42 U.S.C. § 300jj-11(a).

*The National Coordinator Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations*

22. The following year, the Department of Health and Human Services adopted the Meaningful Use regulations. *See* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES, *Medicare and Medicaid Programs; Electronic Health Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). In introducing the final regulations the agencies stated as follows: "Certified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.*, 44321.

23. One central component of the meaningful use regulations was the ability for patients to access their health care records online. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients with the ability *to view online*, download, and transmit information about a hospital admission.") (emphasis added); *see also id.* at (ii)(B) (same); REBECCA MITCHELL COELIUS, *Get the facts regarding view, download and transmit 2014 requirements*, HealthITbuzz, The Latest on Health IT from the ONC, at pg. 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will attest for *use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.") (emphasis in original).

24. The regulations required health care providers to attest to the National Coordinator and to the Centers for Medicare and Medicaid Services on their progress with respect to this criteria in particular. *See* 45 C.F.R. § 170.314(e)(1)(i) (requiring reporting on "Patient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3d party the data specified below," including "[t]he Common [Meaningful Use] Data Set"); 45 C.F.R. § 170.102 (Definitions) (defining the term "Common [Meaningful Use] Data Set" to include "[s]moking status," "[m]edications," "[m]edication allergies," "[l]aboratory tests," "[l]aboratory

value(s)/result(s)," "[v]ital signs," "[c]are plan field(s), including goals and instructions," and "[p]rocedures").

<u>The National Coordinator Directs Healthcare Providers to Make Patient Portals Available to their Patients Online</u>

25. To meet these criteria, the federal government directed health care providers to make online patient portals available to their patients: "You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively into your practice operations." NAT'L LEARNING CONSORTIUM, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013).

26. The government told health care providers that they "should understand the elements of an effective portal program and apply them to the specific needs of your practice." *Id*. Recommended governmental actions included "1. Learn the benefits of patient portals for patients and providers. 2. Understand how a patient portal helps achieve meaningful use requirements. 3. Implement proactive, engaging portal features. 4. Implement the portal with a systematic process. 5. *Actively promote and facilitate portal use.*" *Id*.

27. The National Coordinator subsequently issued a "Patient Engagement Playbook," which was described as "a tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT – particularly electronic health records (EHR) patient portals – to engage patients in their health and care." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Patient Engagement Playbook* (last updated Apr. 17, 2019).

28. The National Coordinator has also specified how providers can optimize such portals, explaining that they "must be engaging and user-friendly"; "how a patient portal helps achieve meaningful use requirements"; and how a provider can "actively promote and facilitate portal use." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (2013), available at https://www.healthit.gov/sites/default/files/resources/nlc_how_to_optimize_patientportals_for_patientengagement.pdf.

29. The National Coordinator has also published guidance for private providers to follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated that "federal agencies" were to "<u>collaborate with</u> . . . private stakeholders to . . . build a culture of electronic health information access and use." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan 2015-2020*, available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf (emphasis added). And, in the 2020-2025 plan, it noted that this has already happened, saying: "Federal, state, and local governments, along with the private sector, have worked together to help digitize health information and healthcare." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan 2020-2025* available at https://www.healthit.gov/sites/default/files/page/2020-10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf ("2020-2025 Strategic Plan").

30. In addition to this guidance, CMS has created its own portal, offering a model for private providers to follow. To optimize individual engagement with the portal, CMS relies on third-party marketers, like Google and Facebook. By working with over two dozen third-party servicers, CMS is able to provide users with the information most relevant to them. *See generally* Medicare.gov, Privacy Policy (explaining that website "users' activity on third-party websites that Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS).

<u>El Camino Makes a Patient Portal and Electronic Health Information Exchange Available Online to El Camino Patients in Direct Furtherance of this Federal Mission</u>

31. The El Camino Health patient portal and electronic Health Information Exchange ("HIE") are tools leveraged and promoted by El Camino for its patients' use as a direct result of the federal initiative to make health care records available to patients online. Since leveraging the patient portal and electronic HIE, El Camino has continually met the Meaningful Use criteria, and has thus received incentive payments from the federal government. If necessary, El Camino is prepared to submit a declaration supporting its participation in the Meaningful Use program.

### *El Camino Is A "Person"*

32. By the plain terms of the statute, removal is permitted by "any person acting under that officer." 42 U.S.C. § 1442(a)(1).

33. While the statute is silent as to the definition of a "person", organizations, corporate defendants, and government entities have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g., Arness v. Boeing N. Am., Inc.,* 997 F. Supp. 1268, 1272 (C.D. Cal. 1998); *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992); *Overly v. Raybestos-Manhattan*, No. C-96-2853-SI, 1996 U.S. Dist. LEXIS 13535, at *7 (N.D. Cal. Sept. 6, 1996); *Malek v. Blackmer Pump Co.*, No. CV 15-04454 SJO (JEMx), 2015 U.S. Dist. LEXIS 97755, at *5 (C.D. Cal. July 24, 2015).

34. El Camino is a California nonprofit corporation and since the federal officer statute is to be broadly construed, El Camino qualifies as a person under that statute.

### *There is a Causal Nexus Between El Camino's Actions and Plaintiff's Claims*

35. To demonstrate a causal nexus, the private person must show: (1) that the person was "acting under" a federal officer in performing some "act under color of federal office," and (2) that such action is causally connected with the plaintiff's claims against it. *See Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244–50 (9th Cir. 2017). The federal officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147–49, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007).

### *El Camino is Acting Under a Federal Officer*

36. This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior," and whether the relationship between the government and private entity involves "detailed regulation, monitoring, or supervision." *Goncalves*, 865 F.3d at 1245 (citing to *Watson*, 551 U.S. at 152).

37. Here these fundamental and liberally-construed requirements are easily met. The federal government is incentivizing, regulating, monitoring, and supervising El Camino's actions in the Meaningful Use program in order to meet the federal government's national priority of interoperable health information technology.

38. First, El Camino (along with numerous other healthcare entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information. Notably, the federal government itself has repeatedly acknowledged the private sector's essential role in the project, most recently stating that "the federal government and private sector have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

39. Second, in the absence of El Camino's actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscore, it would likely attempt to do exactly that.

40. Third, the government has specified how to best enhance patient engagement, including through a patient portal. It has clarified how to generally design the portals, and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

41. Finally, the government has created an office dedicated to this issue and has closely monitored the work of private entities (like El Camino). It has also supervised the general development of this information technology infrastructure. And, because Meaningful Use incentives have been available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes El Camino and comparable organizations to not only maintain public websites and/or patient portals, but also to achieve meaningful use of them.

42. In like circumstances, courts have liberally construed the "acting under" requirement, holding that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *UPMC*, 2020 WL 4381675, at *6 (holding that the University of Pittsburgh Medical Center's participation in the Meaningful Use Program was sufficient to

satisfy the "acting under" requirement necessary for the federal officer removal statute); *see also Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (same; "[b]ecause [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

43.     In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of Plaintiff's personally identifiable information to third parties for internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The UPMC court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *See, e.g.*, "UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria." *Id*. at *6. The UPMC court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope the private entity's duties is the very thing that should be left to a federal court to decide." *Id*. at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." *Id*. at **9-10. That low bar is clearly met here. Here, as in *UPMC*, "[t]here is plainly a connection or association between [the medical provider's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." *Id*.

### *Plaintiff's Claims Relate to the Actions Under Color of Federal Office*

44.     Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office. As the *UPMC* decision shows, this requirement is liberally construed and easily met here. *UPMC*, 2020 WL 4381675, at *12 ("There is plainly a connection or association between UPMC's website management and marketing strategies and the

Meaningful Use program, particularly the incentives that are tied to patient participation and usability.").

45. Plaintiff's Complaint directly challenges El Camino's website analytics practices, which promote "meaningful use" by helping to drive patients to the El Camino website and to the patient portal.

46. Plaintiff's Complaint also generally targets El Camino's alleged tracking of online behaviors through source code and cookies, along with the use of marketing companies in conjunction with its public medical website. The Meaningful Use program envisions these activities, as manifested by the federal government's own use of these codes and third parties for its Medicare website.

47. Indeed, as Plaintiff herself alleges, the entire point of using the third-party services is to direct traffic to, and increase engagement with, El Camino's websites. For example, she alleges that Facebook Pixel is a "piece of code" that "tracks the people and type of actions they take." Compl. ¶ 27 (internal quotations and citation omitted).

### *El Camino Raises Colorable Federal Defenses to Plaintiff's Claims*

48. The final requirement for removal under this statute erects a low bar and merely requires that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v. Cal.*, 489 U.S. 121, 129-30 (1989); *see also Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.").

49. Defendant intends to assert several defenses, but by way of illustration and not limitation, there is at least one colorable federal defense to the claims at issue here that satisfy this requirement.

50. In response to Plaintiff's repeated claims that "protected health information" was disclosed, El Camino will argue that the information purportedly disclosed (*i.e.*, IP addresses and other web metadata) is outside of the purview of protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). This is a duty-based defense that El Camino had no duty under HIPAA. "In the federal officer removal context, a duty-based

defense must be one that is based on a federal duty to act, or the lack of such a duty, such as denying alleged violations of a federal duty." *UPMC*, 2020 WL 4381675 at *6 (W.D. Pa. July 31, 2020) (citations and quotations omitted). The Northern District of California has already held in an analogous case against numerous health care providers challenging alleged disclosures on the Internet through routine website traffic that the information allegedly transmitted is not protected under HIPAA. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to satisfy this element's low bar.

51. Second, El Camino will argue that federal preemption applies here. "A defense based on federal preemption of state law is also sufficient to raise a colorable federal defense for the purposes of the federal officer removal statute." *UPMC*, 2020 WL 4381675 at *7. In *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 343 (2001), the Supreme Court held that plaintiffs' state law fraud on the Food and Drug Administration claims brought against the defendant inevitably conflicted with the FDA's responsibility to police fraud consistently with the Agency's judgment and objections. The Supreme Court held that federal preemption is warranted where "the relationship between a federal agency and the entity it regulates is inherently federal in character." *Id.* at 347. As the *UPMC* court recognized under similar circumstances, "the relationship between [a health care provider] and DHHS is 'inherently federal' in nature, such that the issue of whether [Plaintiff's] state-law claims are preempted under the principles articulated in *Buckman* should be decided by a federal court." *UPMC*, 2020 WL 4381675 at *7.

52. Because each of the requirements of the statute are satisfied, removal to this Court is proper.

### PROCEDURAL REQUIREMENTS FOR REMOVAL

53. El Camino satisfies all of the procedural requirements under 28 U.S.C. § 1446.

54. El Camino is filing this Notice of Removal within thirty (30) days of its receipt of the Complaint by "service," 28 U.S.C. § 1446.

55. El Camino files this Notice in the United States District Court of the Northern District of California, because the State court in which the action is pending, the Superior Court of

Santa Clara County, is within this federal judicial district. This Notice is signed pursuant to Federal Rules of Civil Procedure, Rule 11.

56.  El Camino has attached hereto as **Exhibit "A"** is a true and correct copy of "all process, pleadings, orders, and other documents," currently on file in the state court, including Plaintiff's Complaint.

57.  Upon filing this notice, El Camino will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the State court.

58.  Pursuant to Federal Rule of Civil Procedure 7.1, El Camino is filing a Corporate Disclosure Statement concurrently with this Notice of Removal.

## CONCLUSION

59.  As set forth above, Plaintiff's Complaint directly challenges practices and procedures El Camino has taken acting under color of federal law in implementing federal policy to nationalize the health information technology infrastructure. Plaintiff's Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

Respectfully submitted,

Dated: May 12, 2023        **BAKER & HOSTETLER LLP**

By:  /s/ Teresa C. Chow
     TERESA C. CHOW

*Attorneys for Defendant*
EL CAMINO HOSPITAL

# PROOF OF SERVICE

I, Nancy L. Brazil, declare:

I am employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 11601 Wilshire Boulevard, Suite 1400, Los Angeles, CA 90025-0509. On May 12, 2023, I served a copy of the within document(s):

### DEFENDANT'S NOTICE OF REMOVAL

☑ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☑ by transmitting via electronic mail the document(s) listed above to the e-mail address(es) set forth below on this date and the transmission was reported as complete and without error.

**BURSOR & FISHER, P.A.**
L. Timothy Fisher
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone:   925.300.4455
Facsimile:   925.407.2700
E-Mail:      ltfisher@bursor.com

*Attorneys for Plaintiff*
INDIGO SPALINGER, individually and on behalf of all other persons similarly situated

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone:   646.837.7150
Facsimile:   212.989.9163
E-Mails:     jarisohn@bursor.com
             pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly
701 Brickell Avenue, Suite 1420
Miami, FL 33131-2800
Telephone:   305.330.5512
Facsimile:   305.676.9006
E-Mail:      creilly@bursor.com

**DRURY LEGAL, LLC**
Scott R. Drury
6 Carriage Lane
Highwood, IL 60040
Telephone:   312.358.8225
E-Mail:      scott@drurylegal.com

1    I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on May 12, 2023, at Los Angeles, California.



Nancy L. Brazil

PROOF OF SERVICE